A10A1792. POLK COUNTY et al. v. ELLINGTON et al.
(702 SE2d 17)

BLACKBURN, Senior Appellate Judge.

This is an action for negligence and wrongful death brought by Raymond Ellington, individually and in his capacity as the administrator of the estate of his wife against Polk County and its County Commissioners (collectively "the County Defendants"); Curtis Vincent, individually and in his official capacity as director of Polk County Emergency Medical Services ("EMS"); and Shannon Prater,

---

194

individually and in his capacity as an employee of Polk County EMS.[1] The County Defendants, Vincent, and Prater appeal from the denial of their motion for summary judgment, arguing that the trial court erred in holding: (1) that the allegedly negligent conduct at issue "arose out of" the use of an insured motor vehicle (an ambulance) and that the sovereign immunity otherwise available to the County Defendants and to Vincent and Prater, in their official capacities, had therefore been waived under OCGA § 33-24-51; (2) that Vincent and Prater were not entitled to individual, official immunity, because their allegedly negligent conduct involved the performance of ministerial, as opposed to discretionary, duties; and (3) that a question of fact existed as to whether the County received remuneration for providing ambulance service and, therefore, whether any of the appellants were entitled to immunity under OCGA § 31-11-8. Holding that the County Defendants, Vincent, and Prater were all shielded from liability by sovereign and official immunity, we reverse.

> We review a trial court's grant of summary judgment de novo. To prevail on a motion for summary judgment, the moving party must demonstrate that there is no genuine issue of material fact, and that the undisputed facts, viewed in a light most favorable to the party opposing the motion, warrant judgment as a matter of law.

*Porter v. Guill.*[2]

So viewed, the record shows that shortly after midnight on November 13, 2005, Ellington called Polk County 911 to report that his 51-year-old wife was experiencing chest pain that was radiating into her arm and ear. Polk County emergency personnel responded to the Ellington residence, where paramedic Prater performed an assessment of Mrs. Ellington. Prater's examination of Mrs. Ellington included taking her vital signs and her pulse oxygen level and listening to her breathing through a stethoscope. He also asked her to describe her pain, asked whether the pain responded to anything (such as medication), and asked about her medical history. Mrs. Ellington described her pain as "burning," and stated that it had woken her up, but that it had appeared to improve. She also explained that earlier in the week, she had experienced similar pain and an episode of dizziness and weakness, but that those symptoms

---

[1] Ellington also sued Paul Schumpert, M.D., individually and in his capacity as the medical director of Polk County EMS. Dr. Schumpert was not a party to the summary judgment motion at issue and is not a party to this appeal.

[2] *Porter v. Guill*, 298 Ga. App. 782, 783 (681 SE2d 230) (2009).

had improved with rest. Mrs. Ellington further reported that she had a family history of heart disease, with both her father and her sister having suffered heart attacks. According to Prater, Mrs. Ellington was alert, oriented, did not appear to be in distress, and had normal vital signs.

Mr. Ellington and the couple's adult daughters, who were present at the time Prater conducted his assessment of Mrs. Ellington, all testified that Prater told them "the good news" was that Mrs. Ellington was not suffering a heart attack, but instead was experiencing acid reflux.[3] In response to questions from the family, Prater stated that Mrs. Ellington could take an antacid. One of her daughters then gave her that medicine, and her pain seemed to improve.

Prater told Mrs. Ellington that the paramedics would be happy to transport her to the hospital but, apparently believing that she merely had acid reflux, she declined. At Prater's request, Mrs. Ellington signed a statement saying she had "refused transport" — i.e., that she had declined to go to the hospital with the paramedics. Prater advised her to follow up with her personal physician "as soon as possible," and the emergency personnel departed the Ellington house approximately 13 minutes after they had arrived. Less than two hours later, Mrs. Ellington collapsed and died of cardiac arrest.

Following his wife's death, Mr. Ellington brought the current action, alleging that the County Defendants and Vincent had negligently failed to establish or implement a program "to ensure appropriate physician control over the rendering of emergency medical services by EMS personnel to patients who are not in a hospital" or, alternatively, that they had failed to enforce those policies and protocols that were in place. His complaint further asserted that Prater had acted negligently in his assessment of Mrs. Ellington and that he had failed to follow established protocols in treating Mrs. Ellington.

At the time of Mrs. Ellington's death, Polk County had in place certain "EMS Treatment Protocols." These protocols, which were compiled in a separate handbook distributed to County employees, included ones for assessing EMS patients. The assessment protocols contained guidelines for performing primary and secondary patient surveys,[4] and for assessing medical (as opposed to trauma) patients,

---

[3] Prater disputed these statements, insisting that he told Mrs. Ellington that they had no way of knowing whether she was suffering a heart attack, and that there was a possibility that she might be experiencing acid reflux.

[4] The purpose of a "primary" patient survey was "to identify and immediately correct life-threatening problems." In the event no such life threatening problems were immediately identified, the responder would apparently move to a "secondary" patient survey.

pediatric patients, and neurologic patients. The EMS treatment protocols included guidelines for treating specific conditions, and there was a protocol for "cardiac chest pain."[5] Written instructions at the front of the handbook stated: "These protocols may be followed without contacting Medical Control [the hospital emergency room] unless otherwise specified. Any deviation from these protocols should be approved by Medical Control, and therefore will require a[n] MD's signature on the PCR [patient care report]."[6]

The "Medical Patient Assessment" protocol provided, in relevant part:

> A primary survey is done on all medical and trauma patients. In awake medical patients, this may consist only of identifying yourself and noting the patient's responsiveness and general appearance. The formal secondary survey may not need to be done on patients with a specific complaint, such as "chest pain." Assessment must be no less thorough, but it may be limited to the body systems that are pertinent to the presenting problem.

At his deposition, Prater was questioned only about the Polk County EMS protocol for cardiac chest pain. Steps 4 and 5 of that protocol stated, "[p]lace patient on cardiac monitor and pulse oximeter" (step 4) and "obtain 12 lead EKG" (step 5). According to Prater, these steps were never performed on Mrs. Ellington because she was never placed in the ambulance, where the cardiac monitor was located. Prater explained that the cardiac monitor was not an assessment tool, because even the monitor might not show that someone was having a heart attack. Prater also testified that the specific protocols did not become applicable until after an initial assessment was made and unless and until the patient was actually placed in the ambulance for transport to the hospital. He further stated that although the cardiac monitor was "somewhat portable," per standard procedure it was not removed from the ambulance and taken to a patient unless the person was unresponsive — i.e., in need of defibrillation.

After discovery ended, the County Defendants, Vincent, and Prater moved for summary judgment on the grounds that they were

---

[5] The cardiac chest pain protocol was one of several that could apply to cardiac patients. For example, there were also protocols for asystole, bradycardia, tachycardia, acute myocardial infarction, and cardiac arrest.

[6] As best we can tell from the record, a patient care report was a document filled out by paramedics stating what care had been given to the patient. A copy of the report was then given to the hospital emergency room, at the time the patient was delivered.

protected by sovereign and official immunity and therefore could not be held liable for Mrs. Ellington's death. Following a hearing, the trial court denied that motion. This Court granted the application for interlocutory appeal filed by the County Defendants, Vincent, and Prater, and this appeal followed.

1. The doctrine of sovereign immunity shields a county from liability for the torts of its employees and officials. See *Lincoln County v. Edmond*.[7] Thus, "[u]nless sovereign immunity has been waived, that defense bars [Ellington's] claims against [Polk] County, [its] commissioners, and [Vincent and Prater] in their official capacities." *Woodard v. Laurens County*.[8]

In this case, the trial court held that sovereign immunity had been waived under OCGA § 33-24-51. Subsection (a) of that statute authorizes a county to purchase insurance to cover liability for injury "arising by reason of ownership, maintenance, operation, or use of any motor vehicle," while subsection (b) provides that if such insurance is purchased, "governmental immunity shall be waived to the extent of the amount of [such] insurance." The trial court concluded that Mrs. Ellington's death "arose out of" the operation or use of the ambulance driven to her home, because it "arose out of" Prater's failure to utilize the cardiac monitor located in that vehicle. This holding, however, is directly contravened by relevant law.

In a case directly on point, the Supreme Court of Georgia held that sovereign immunity protected a county and county-employed paramedic from liability resulting from the paramedic's alleged negligence in misdiagnosing an EMS patient. See *Harry v. Glynn County*.[9] That misdiagnosis resulted in the paramedic's failure to render the appropriate treatment to the patient, specifically his failure to defibrillate the patient. The Supreme Court of Georgia rejected the argument that the negligence arose out of the use of a motor vehicle (the ambulance) and that sovereign immunity had therefore been waived under OCGA § 33-24-51, explaining:

> The alleged negligence in this case was [the paramedic's] misdiagnosis and failure to use defibrillation, acts which did not involve the use of the ambulance. Indeed, [the paramedic's] treatment of [the patient] began where she collapsed, and although she was moved to the ambulance and was transported in the ambulance, *there is no evidence that the ambulance and its use played any part in [the paramedic's]*

---

[7] *Lincoln County v. Edmond*, 231 Ga. App. 871, 872 (1) (501 SE2d 38) (1998).

[8] *Woodard v. Laurens County*, 265 Ga. 404, 405 (1) (456 SE2d 581) (1995).

[9] *Harry v. Glynn County*, 269 Ga. 503 (501 SE2d 196) (1998).

*diagnosis or choice of treatment.* Any negligence in his acts simply did not "arise from the use of a motor vehicle." Accordingly, . . . no waiver based on the purchase of insurance occurred in this case.

(Emphasis supplied.) 269 Ga. at 504 (1).

Similarly, in *Lincoln County*, supra, this Court held that to invoke the waiver of sovereign immunity under the motor vehicle exception found in OCGA § 33-24-51, a plaintiff "must prove that the defendant's action (misuse of a county vehicle) was both the cause in fact and the proximate cause of the injury." (Punctuation omitted.) 231 Ga. App. at 873 (1). The plaintiff in that case alleged that a county employee had acted negligently when, after being informed of a downed tree, he drove his county truck back to the county garage, rather than proceeding to the scene of the downed tree. We rejected the argument that the ensuing accident arose out of the use (or misuse) of the county truck, thereby abrogating the county's sovereign immunity. Specifically, this Court held "that the *non*-use of a motor vehicle is not encompassed within the meaning of OCGA § 33-24-51 (a)," because "negligent *use* [does not] include[ ] the failure to use at all." (Emphasis in original.) Id. We further explained:

> [A]lthough plaintiff has fashioned a theory under which the county may be held liable, that theory must fail *because the county truck assigned to [the employee] is only tangentially related to his failure to act, which is the true heart of plaintiff's complaint.* Whether [the employee's] failure to act was negligent and the proximate cause of plaintiff's injuries [would] clearly [be] a jury question. But, equally clearly, the absent county truck was not *used* so as to be "both the cause in fact and proximate cause" of the injuries sustained by Edmond. Without such "use," plaintiff's suit against Lincoln County and the Board of Commissioners is barred by the doctrine of sovereign immunity. The trial court's denial of their motion for summary judgment [was] error.

(Citations omitted; emphasis supplied.) Id. at 873-874 (1).

The logic of both *Harry* and *Lincoln County* applies with equal force to this case. As in *Harry*, "there is no evidence that the ambulance and its use played any part in [Prater's] diagnosis [of] or choice of treatment" for Mrs. Ellington. 269 Ga. at 504 (1). Thus, the county ambulance was, at best, tangentially related to Prater's

failure to use the cardiac monitor on Mrs. Ellington. And, we decline to hold that the use, failure to use, or misuse of emergency medical or safety equipment arises out of the maintenance or operation of a county vehicle merely because such equipment is stored or transported on, is removed from, or is left off of, such a vehicle. "The [operation or] maintenance of any motor vehicle[,] as used in [OCGA] § 33-24-51 (a)[,] has nothing to do with whether [certain] rescue equipment was present on [a county] vehicle." (Punctuation omitted.) *Robinson v. DeKalb County*[10] (reversing trial court's ruling that victim's drowning, which occurred after firemen did not have a rope long enough to reach him, arose out of the maintenance of the fire truck). Rather, for a waiver of sovereign immunity under OCGA § 33-24-51 to occur, the injury complained of must " 'originate in' or 'flow from' the use of the [motor vehicle] *as a motor vehicle.*" (Emphasis supplied.) *Saylor v. Troup County*[11] (finding no waiver of sovereign immunity where, at the time of the injury, the county vehicle in question "was inoperative [and] parked off the roadway with its engine not engaged" and the plaintiff "was merely using the bumper of the van for placement of [a] vise," which was being used to sharpen the swingblade that injured plaintiff).

As the foregoing demonstrates, the liability of the County Defendants and Vincent and Prater, in their official capacities, was not predicated on their alleged negligent use of the ambulance as a motor vehicle. Accordingly, there has been no waiver of sovereign immunity, and the trial court erred in denying summary judgment in favor of the County Defendants and Vincent and Prater, in their official capacities.

2. We next address whether Vincent and Prater were entitled to official immunity for the claims asserted against them in their individual capacities.

"In Georgia, the doctrine of official immunity provides that a public officer or employee may be personally liable for his negligent ministerial acts, but he may not be held liable for his discretionary acts unless such acts are wilful, wanton, or outside the scope of his authority." *Clive v. Gregory*.[12] "The rationale for this immunity is to preserve the public employee's independence of action without fear of lawsuits and to prevent a review of his or her judgment in hindsight." (Punctuation omitted.) *McDowell v. Smith*.[13]

[10] *Robinson v. DeKalb County*, 261 Ga. App. 163, 165 (2) (582 SE2d 156) (2003).
[11] *Saylor v. Troup County*, 225 Ga. App. 489, 489 (484 SE2d 298) (1997).
[12] *Clive v. Gregory*, 280 Ga. App. 836, 841 (2) (635 SE2d 188) (2006).
[13] *McDowell v. Smith*, 285 Ga. 592, 593 (678 SE2d 922) (2009).

> A ministerial act is one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty. A discretionary act calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed. *Procedures or instructions adequate to cause an act to become merely ministerial must be so clear, definite and certain as merely to require the execution of a relatively simple, specific duty.*

(Punctuation omitted; emphasis supplied.) *Kennedy v. Mathis.*[14]

(a) The trial court found that Prater was negligent for failing to follow the written protocol applicable to cardiac chest pain and that this, in turn, was a failure to perform a ministerial task. We disagree, holding that Prater's alleged negligence occurred during the performance of his discretionary duties.

As an initial matter, we note that the trial court's holding is premised on the erroneous assumption that, under the circumstances presented, Prater had no choice but to follow the cardiac chest pain protocol, taking each of the 17 steps listed therein sequentially. The County's EMS protocol handbook, however, clearly left its emergency responders with discretion regarding if, when, and how to implement the specific protocols.

Prater's testimony established that before applying any particular treatment protocol, he was required to perform a patient assessment to determine what (if any) treatment protocol should apply. This testimony, which was unrefuted, is supported by the EMS protocol handbook, which included instructions for performing primary and secondary assessments of all patients and for performing an assessment of medical (as opposed to trauma) patients. A review of these written assessment protocols shows that they were for the purpose of determining the nature of the patient's medical problem or traumatic injury and what steps to take. A paramedic, therefore, was to exercise his skill and judgment to assess the patient and determine what, if any, treatment protocol should be followed. Prater further testified that the cardiac chest protocol was never put into place with respect to Mrs. Ellington, following his assessment of her, because she declined transport to the hospital. Notably, Prater's testimony that this protocol would not be applied unless and until a patient was being taken to the hospital as a potential cardiac patient is undisputed. Thus, "[i]t appears from the undisputed evidence in

---

[14] *Kennedy v. Mathis*, 297 Ga. App. 295, 297 (1) (676 SE2d 746) (2009).

this case that [Prater's] duty in responding to the emergency involved here was first to ascertain the condition of the patient, then to provide the treatment appropriate to that condition while transporting the patient to the hospital" and that each of these duties involved the exercise of discretion. *Harry*, supra, 269 Ga. at 505 (2).

Moreover, the fact that Mrs. Ellington's decision to refuse transport may have resulted from Prater's negligent assessment of her does not mean that Prater was without discretion in performing the assessment. Where, as here, written policies or procedures leave an employee with some discretion in how to implement them, their application is itself a discretionary function. See *Perkins v. Morgan County School Dist.*[15] (school's written dismissal policy "simply informed [the employee] that the rules in the handbook, when properly construed, required her to exercise discretion as to the manner in which" that policy was implemented). Compare *McDowell*, supra, 285 Ga. at 593 (employee "was not called on to exercise personal judgment, examine facts, reach reasoned conclusions or act in a way not specifically directed. On the contrary, she was merely required to execute specific duties as dictated by the school checkout policies").

Furthermore, assuming that Prater was applying the cardiac chest pain protocol to Mrs. Ellington, we are not persuaded that the protocols themselves mandated that a paramedic take every step listed therein in the order listed. Indeed, the cardiac chest pain protocol includes two items numbered 12 and two items numbered 13. It also instructs emergency responders that they "may" take certain actions and that they "should consider" others, if the circumstances warrant. This language is not "so clear, definite and certain as merely to require the execution of a relatively simple, specific duty." (Punctuation omitted.) *Kennedy*, supra, 297 Ga. App. at 297 (1). Accordingly, this language is not sufficient to translate the application of the cardiac chest pain protocol into a ministerial duty, to be applied automatically under a given set of conditions. Id.

Finally, we note that case law supports the conclusion that responding to an emergency "is not a relatively simple, specific duty." (Punctuation omitted.) *Smith v. Bulloch County Bd. of Commrs.*[16] Rather, it is a discretionary task, requiring the exercise of "[p]ersonal judgment [to] determin[e] how best to proceed." Id. Thus, in *Schulze v. DeKalb County*,[17] we held that paramedics could

---

[15] *Perkins v. Morgan County School Dist.*, 222 Ga. App. 831, 835 (2) (476 SE2d 592) (1996).

[16] *Smith v. Bulloch County Bd. of Commrs.*, 261 Ga. App. 667, 669 (1) (583 SE2d 475) (2003).

[17] *Schulze v. DeKalb County*, 230 Ga. App. 305, 308 (2) (496 SE2d 273) (1998).

not be held liable for failing to immediately transport a pregnant patient in obvious distress to the hospital, explaining:

> Upon arriving at [the residence], the paramedics examined the facts: [the patient] was bleeding but was capable of walking down stairs and her small child was the only other person at home with her. They exercised personal deliberation and judgment in delaying transportation of [the patient] to the hospital for several minutes to make certain that the small child would not be left home alone.

Thus, we concluded that under the circumstances, "the paramedics' actions . . . were clearly discretionary." Id.

Similarly, Prater's testimony also establishes that he (like most first responders) was required to examine the facts he was presented with and exercise personal deliberation and judgment in making his assessment of Mrs. Ellington. Under the circumstances, therefore, Prater's acts were discretionary, rather than ministerial. See *Harry*, supra, 269 Ga. at 505 (2) (actions of paramedic in first assessing and then treating an EMS patient "were clearly discretionary").

(b) We also disagree with the trial court's conclusion that Vincent, in his individual capacity, is not entitled to official immunity from Ellington's claim that he was negligent in failing to train or supervise Polk County EMS employees.

"This Court has consistently held that the operation of a police department, including the degree of training and supervision to be provided its officers, is a discretionary governmental function as opposed to a ministerial, proprietary, or administratively routine function." (Punctuation omitted.) *Russell v. Barrett*.[18] Ellington has offered no argument why, in this regard, we should view an EMS department differently from a police department, and we can discern none. Accordingly, we hold that any failure by Vincent to draft a particular policy or to implement the existing policy, either through training or otherwise, constitutes a discretionary act. See *Middlebrooks v. Bibb County*[19] (decision on how to implement an existing policy, and whether to supplement the same, was discretionary); *Carter v. Glenn*[20] ("the act of establishing a policy in the first place is discretionary"). Accordingly, given that Ellington has not shown any evidence of malice by Vincent, he is entitled to official immunity on this claim.

---

[18] *Russell v. Barrett*, 296 Ga. App. 114, 120 (3) (673 SE2d 623) (2009).

[19] *Middlebrooks v. Bibb County*, 261 Ga. App. 382, 386-387 (3) (582 SE2d 539) (2003).

[20] *Carter v. Glenn*, 249 Ga. App. 414, 417 (2) (548 SE2d 110) (2001).

3. In light of our holdings that sovereign and official immunity apply here in Divisions 1 and 2, supra, we need not further address whether the County received remuneration for providing ambulance service and, therefore, whether it was entitled to immunity under OCGA § 31-11-8.

*Judgment reversed. Barnes, P. J., and Senior Appellate Judge William LeRoy McMurray, Jr., concur.*

DECIDED SEPTEMBER 23, 2010 — 

*O'Quinn & Cronin, Michael A. O'Quinn*, for appellants.
*Brinson, Askew, Berry, Seigler, Richardson & Davis, Robert L. Berry, Jr., Stephen B. Moseley, Roy E. Barnes, John R. Bevis, James C. Tribble*, for appellees.